**PHOENIX ROOFING, INC., Petitioner,**

v.

**Elizabeth DOLE, Secretary of Labor,**

**and**

**Occupational Safety and Health Administration, Respondents.**

No. 88–4492.

United States Court of Appeals, Fifth Circuit.

June 9, 1989.

---

Robert E. Rader, Jr., Dallas, Tex., for petitioner.

Patrick D. Gilfillan, Barbara E. Kahl, Ann Rosenthal, Ray H. Darling, Executive Secretary, OSHRC, Washington, D.C., James A. Wirz, Office of the Solicitor, Atty. for Secretary of Labor, U.S. Dept. of Labor, Dallas, Tex., for respondents.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The petitioner in this case contests a citation issued by the Occupational Safety and Health Administration (OSHA) for an asserted violation of certain safety regulations. Our task is twofold: On the one hand, we must determine at what point the

zealous enforcement of administrative employee safety regulations becomes hyper-technical and counterproductive in light of employer compliance with the purposes of the regulations; on the other hand, we must circumscribe carefully the extent to which employers may disregard the regulations and make their own safety evaluations without facing serious penalties.

## I. *Factual and Procedural Background.*

The determinative facts in this case are not complicated. Petitioner Phoenix Roofing, Inc. ("Phoenix"), was reroofing a building at Dallas's Love Field Airport at the time the citation was issued. The roof measured 350 feet by 150 feet. However, work was performed to completion on sections measuring only 24 feet by 32 feet. Each section was subjected to a three-phase process.

There is no dispute that Phoenix complied with all appropriate regulations through the first and most of the second phases of work on the section in question. However, OSHA contends that Phoenix failed to meet fall-protection requirements near the completion of the second phase and during the third phase.

Phoenix admits that it was in technical noncompliance with the regulations during the third stage because of its use of monitors as the sole safety device. It contends, however, that the employment of any of the conforming methods at this point was either infeasible or would have created additional dangers because the work involved the pouring of hot asphalt. Phoenix also denies that there was sufficient evidence indicating a violation during phase two.

OSHA cited Phoenix for its use of monitors as an exclusive safety device, pursuant to 29 C.F.R. § 1926.500(g)(1), (3). The citation was issued after OSHA's compliance officer had observed, for about one-half hour, six Phoenix employees working near the edge of the roof.[1] Phoenix contested the citation before an administrative law judge (ALJ), who dismissed the charge that was issued under section 1926.500(g)(3) but

upheld the one issued under section 1926.-500(g)(1). Following proper administrative procedures, Phoenix then petitioned the Occupational Safety and Health Review Commission (OSHRC) for review of the ALJ's decision; review was denied because OSHRC did not have a quorum at that time. This petition followed.

## II. *Standard of Review.*

We must uphold the ALJ's findings of fact if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a). *Fred Wilson Drilling Co. v. Marshall*, 624 F.2d 38, 40 (5th Cir.1980). Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ryder Truck Lines, Inc. v. Brennan*, 497 F.2d 230, 232 (5th Cir.1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). We will not reweigh the evidence or independently evaluate evidentiary conflicts. *Irwin Steel Erectors, Inc. v. OSHRC*, 574 F.2d 222, 223–24 (5th Cir.1978) (per curiam).

In interpreting administrative statutes and regulations, we accord great deference to those officers and bodies charged with their administration. *Brock v. Schwarz-Jordan, Inc.*, 777 F.2d 195, 196 (5th Cir. 1985) (per curiam). Ordinarily, we will reverse on such matters only upon finding a plain error or an inconsistency with the regulation's purpose. *United Steelworkers of Am. v. Schuylkill Metals Corp.*, 828 F.2d 314, 319 (5th Cir.1987) (citing *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965)).

## III. *Violation of 29 C.F.R. § 1926.500(g)(1).*

In order to comply with 29 C.F.R. § 1926.500(g)(1), when working on a roof more than 50 feet in width, an employer must use either (i) a motion-stopping device, such as safety nets or guardrails, at the edge of the roof, or (ii) a warning line which an employee will bump into when he

---

**1.** The citation stated that the employees were working 4 feet from the edge.

or she is within 6 feet of the edge of the roof.[2] At the time the instant citation was issued, Phoenix admits that it was working on a roof more than 50 feet in total width without employing either type of approved safety measure. Instead, it was using a monitor system whereby two experienced employees had as their sole responsibility the duty to watch those working on the roof and to warn them if they approached the edge.

Under the regulations, such a safety system is acceptable as an exclusive safety measure only as to work on a roof less than 50 feet in total width. 29 C.F.R. § 1926.500(g)(1)(iii). On wider roofs, the visual difficulties in monitoring, and the problem of hearing far-away monitors, are thought by the agency to be too great for this method to be effective. *See* 29 C.F.R. § 1926.502(p)(7); 45 Fed.Reg. 75,621 (Nov. 14, 1980).

Phoenix acknowledges this consideration but argues that it constructively complied with the requirements in that the roof section it was working on was without question less than 50 feet wide, so that workers were never spread over an area of more than 50 feet. Moreover, Phoenix maintains, apparently without contradiction from OSHA, that it was physically impracticable or impermissible under Federal Aviation Administration regulations to use any of OSHA's approved methods during phase three because of the characteristics of the building and the type of work being performed.[3]

Finally, Phoenix reminds us that safety monitors are a permissible form of protection for employees working within 6 feet of the edge where only a warning line is in place. Here, the citation was issued based upon the compliance officer's observation of employees working 4 feet from the edge.[4] Thus, even though there was no

---

2. Where a warning line system is in place, employees working outside the line must be protected through use of either safety monitors or motion-stopping devices. 29 C.F.R. § 1926.500(g)(1)(ii).

3. OSHA does contend, however, that the citation was issued at the end of phase two and that motion-stopping devices could have been used, since asphalt was not yet being poured so as to make this method too dangerous.

4. In his able dissent, Judge Garwood apparently agrees that a *de minimis* classification is mandated as a matter of law if the measures employed provide protection equal to or greater than that required by regulation. He takes issue only with the conclusion that such was the case here. His belief that the monitors did not provide equivalent protection is premised upon two misinterpretations of the circumstances present here.

The dissent first accepts as conclusive the compliance officer's testimony that, in theory, monitors alone can never provide protection equivalent to a warning line system (for workers inside the line) because they always present some possibility, however remote, of human error. However, treating such testimony as precluding any finding that monitors do not provide equivalent protection is, at best, a doubtful proposition.

Taken in the context in which it was uttered, this testimony amounts to no more than the compliance officer's musing about an abstract possibility which she herself obviously did not consider important to the case. When pressed by Phoenix's counsel to make a realistic safety comparison, she readily admitted that monitors were at least equal to warning lines. Moreover, as previously discussed, the ALJ did not make any finding, either directly or indirectly, based upon this testimony; instead, his holding rested entirely upon an interpretation of the statute that would preclude a *de minimis* classification even where equal or greater safety is assured by non-complying measures. This is the identical position urged by OSHA's counsel at oral argument.

Nevertheless, even assuming, *arguendo*, that we could not determine conclusively, from the record before us, that use of the monitors guaranteed safety equal or greater to warning lines for those workers working inside the line, our holding is still unaffected since, as discussed repeatedly above, the citation was issued after observing *only* employees working near the edge of the roof. As to these employees, Judge Garwood concedes that our analysis is correct. However, even though the compliance officer only observed workers who would have been outside of any warning line, and though there is no record indication of anyone working within the area whom such a line could possibly protect, the dissent asserts that it is still reasonable to infer the presence of such workers in the absence of Phoenix's proof to the contrary. We cannot agree.

The dissent would require a cited party affirmatively to disprove any hypothecated set of facts which an appellate court might assume to have existed at the time of the citation, regardless of any record support. But such an approach overlooks the enforcement scenario employed by OSHA: A compliance officer visits a

warning line, the monitors provided at least the same protection which *the workers in question* would have received if there had been a warning line in place.[5] In fact, Phoenix's system likely provided greater protection, since Phoenix assigned at least two employees to monitor a work area for which the regulations would require only one.[6]

While it is evident that Phoenix was in compliance with the spirit of the regulations, and that the safety measures taken equaled or exceeded the protections afforded by the approved methods, we nevertheless cannot reverse on such a basis.[7] This is because as a matter of undisputed fact, Phoenix's actions did violate OSHA's interpretation of the regulation that the entire roof, rather than the effective work area, must be measured in determining the applicability of the 50–foot convention.

Moreover, under the above standard of review, we are not free to overrule this plain-meaning interpretation and substitute our own. *See Austin Commercial v. OSHRC*, 610 F.2d 200, 201 (5th Cir.1979) (per curiam); *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir.1976). Section 1926.500(g)(1)(iii) explicitly provides that the width of the "roof" controls; section 1926.502(p)(6) defines "roof" as "the exterior surface on the top of a building." Phoenix's common-sense argument that

"work area" width should control simply cannot be sustained once OSHA has chosen to issue citations based upon the literal wording of the regulation.

It would also be improvident for us to overrule OSHA's interpretation of its regulations, for to do so would send employers the message that they could ignore the obvious mandates of the safety regulations and independently determine what, if any, measures should be undertaken in a given situation. In this case, we are satisfied that the measures taken provided protection equal to or greater than those required by regulation.[8] In its brief on appeal, OSHA does not appear to contend otherwise. However, under our settled precedent, "an employer must follow the law even if it has a good faith belief that its own policy is wiser." *RSR Corp. v. Brock*, 764 F.2d 355, 363 (5th Cir.1985).

### IV. *De Minimis Classification.*

A violation of the Occupational Safety and Health Act of 1970 (the "Act") is designated as serious, not serious, or *de minimis*. *See Brennan v. Butler Lime & Cement Co.*, 520 F.2d 1011, 1019 n. 10 (7th Cir.1975). "Absent ... a direct, immediate nexus between noncompliance and employee safety or health, a violation of an OSHA standard may be classified as *de minim-*

---

workplace, observes a violation and reports on it, and a citation is issued. Hence, this case involves what the compliance officer saw, not what she did not see.

5. This is because these workers, being already outside the 6–foot line, of course would receive no benefit from such a warning line located 6 feet from the edge.

6. The regulations require 1 monitor every 50 feet. *See* 29 C.F.R. § 1926.500(g)(1)(iii). Phoenix was using at least 2 monitors within a 32–foot area, equivalent to 1 monitor every 16 feet. Hence, it actually had more than 3 times as many monitors (50/16 = 3.1) as the agency mandates.

7. OSHA's only suggestion that warning lines may have provided better protection is based upon the compliance officer's testimony that there is always a possibility of human error using just monitors. However, the ALJ impliedly rejected this contention in relying exclusively upon a plain-meaning interpretation of

the regulations without regard for any possible safety differentials.

In any event, we note that this testimony is irrelevant, as the instant citations were issued based upon the compliance officer's observation of employees working near the edge of the roof, for whom a warning line could offer no protection. As discussed *supra*, these workers could have, and would have, been protected by monitors even if a warning line were in place to protect other employees who were more than 6 feet from the edge. Hence, in theory the remote possibility of human error would have been at least equal in both cases. In reality, the possibility of human error was undoubtedly reduced by Phoenix's use of at least 2 monitors. *See supra* note 6.

8. Moreover, this is not a case in which an employer has "cut corners" in its compliance efforts: It is reasonable to assume that the use of monitors was at least as expensive as the mandated alternative measures for which the agency argues.

*is....* The consequence of [such] a determination ... is that, though a violation has [technically] occurred, abatement is unnecessary and no penalty is imposed." *Donovan v. Daniel Const. Co.,* 692 F.2d 818, 821 (1st Cir.1982) (citations omitted). *See also Keco Industries, Inc.,* 11 O.S.H.Cas. (BNA) 1832, 1834 (Rev. Comm'n 1984).

■ Despite Phoenix's convincing argument that its violation was purely technical at worst and created no additional safety risk, the ALJ found it to be "serious" and deserving of penalties. Phoenix concedes that a *de minimis* citation, rather than no citation at all, may have been appropriate but asserts that the "serious" designation is uncalled for here. We agree with Phoenix and reverse the agency's determination, based upon our conclusion that the ALJ applied an improper legal analysis.

■ There are, conceptually, at least three circumstances under which a violation may be considered *de minimis:* (1) Where no injury will result, or any injury will be minor; [9] (2) where the possibility of injury is remote; [10] or (3) where there is no significant difference between the protection provided by the employer and that which would be afforded by technical compliance with the standard.[11]

In this case, we need consider only the third type of *de minimis* classification. The compliance officer acknowledged that Phoenix's use of monitors, given the less–than–50–foot–wide work area, at least equaled the protection that would have been provided by using warning lines in compliance with the standard. Moreover, as discussed *supra,* the citation was based only upon the compliance officer's observation of employees working near the edge of the roof who, under the regulations, could have been protected by monitors. The additional presence of a warning line would be only for the protection of employees working further from the perimeter. The ALJ nonetheless denied *de minimis* classification, based upon the likely seriousness of an injury caused by any fall.

We have no doubt that such an injury indeed would be serious or fatal. However, it would still be exactly the same type of injury that would occur with equal or greater frequency using warning lines. Here, the protections which Phoenix employed provided safety equal to or greater than that imposed by regulation. Accordingly, we conclude that a *de minimis* classification is not only appropriate but required as a matter of law by OSHA's own precedent.

■ To affirm the denial of a *de minimis* classification in this case would prevent the use of such a designation in any case in which serious injury is possible, regardless of whether compliance with standards would fail to provide better protection.[12] The *de minimis* category thus

---

9. *See Anoplate Corp.,* 12 O.S.H.Cas. (BNA) 1678, 1688 (Rev.Comm'n 1986); *Kenneth P. Thompson Co.,* 8 O.S.H.Cas. (BNA) 1696, 1703 (Rev. Comm'n 1980).

10. *See Keco Industries, Inc.,* 11 O.S.H.Cas. (BNA) at 1835; *Hood Sailmakers, Inc.,* 6 O.S.H.Cas. (BNA) 1206, 1208 (Rev.Comm'n 1977).

11. *E.g., Clifford B. Hannay & Son, Inc.,* 6 O.S.H. Cas. (BNA) 1335, 1337–38 (Rev.Comm'n 1978); *Charles H. Tompkins Co.,* 6 O.S.H.Cas. (BNA) 1045, 1047 (Rev.Comm'n 1977).

12. We reject OSHA's argument that § 17(k) of the Act, 29 U.S.C. 666(k), which states that "a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result" from a working condition, requires a finding that the instant violation is serious. Under our precedent, "substantial probability" relates to the likelihood of death or serious injury *if an accident occurs* rather than to the likelihood that the accident will happen in the first place. *See Kelly Springfield Tire Co. v. Donovan,* 729 F.2d 317, 325 n. 12 (5th Cir. 1984); *East Tex. Motor Freight, Inc. v. OSHRC,* 671 F.2d 845, 849 (5th Cir.1982) (per curiam); *Bunge Corp. v. Secretary of Labor,* 638 F.2d 831, 834 (5th Cir. Unit A Mar. 1981); *Shaw Constr., Inc. v. OSHRC,* 534 F.2d 1183, 1185 n. 4 (5th Cir.1976). However, even though under this precedent Phoenix's violation arguably meets the "substantial probability" criterion (since if an accident occurred death or serious injury would be likely), we do not conclude that this alone mandates a "serious" designation.

Implicit in the statutory language and in our cases, and explicit in OSHRC's own precedent, discussed *infra,* is the requirement that an employer's violations must have created a greater likelihood of death or injury causing accidents than compliance would have, not merely that such accidents are possible because of the type

would effectively be limited to such situations as those involving the improper filing of forms. *See Anoplate Corp.*, 12 O.S.H. Cas. (BNA) at 1688. Consequently, the vast majority of cases would call for penalties even if workers were not significantly more endangered. Under such a standard, employers such as Phoenix, who are scrupulously concerned with their employees' safety, would be treated the same as those who flagrantly ignore safety measures altogether.[13] At oral argument, OSHA's counsel admitted that this was the direct implication of its position. There is simply no precedent or policy basis supporting such a result.

In *Clifford B. Hannay & Son, Inc.*, 6 O.S.H.Cas. (BNA) at 1337–38, OSHRC held that a violation was *de minimis* despite the possibility of an explosion causing serious injury or death. The basis for that conclusion was that the electrical equipment used by the employer provided as much protection as technical compliance with the standard would have. Likewise, in *Charles H. Tompkins Co.*, OSHRC reviewed a violation where the potential danger presented was a thirty-foot fall that obviously could cause serious injury or death. Concluding that "climbing safety was not *appreciably diminished* by the additional distance be-

tween the rungs" of a scaffold buck as compared to a ladder, OSHRC found the violation to be *de minimis*. 6 O.S.H.Cas. (BNA) at 1047 (emphasis added).[14]

Given the admissions made by the compliance officer and the fact that the citation was based upon that officer's observation of employees working near the edge of the roof, we find the instant case to be indistinguishable from *Hannay* and *Tompkins* and their progeny. Accordingly, we reverse the denial of the *de minimis* classification and hold that Phoenix's violation is *de minimis* as a matter of law, as it did not *"appreciably diminish"* the workers' safety and in fact probably enhanced it.[15]

OSHA argues forcefully that *RSR Corp. v. Brock* and *Bunge Corp. v. Secretary of Labor* are to the contrary. We cannot agree. In *RSR* we emphasized that employers are not free to make independent safety determinations. 764 F.2d at 363. However, our analysis there went only to the existence of a violation, rather than to whether an acknowledged violation should be characterized as *de minimis* or serious. These are two separate issues that are not, and should not be, subject to the same considerations. To say that an employer commits a violation when it knowingly con-

of work being performed. None of the above cases involved any effective alternative employer safety measures. Instead, the employers relied exclusively upon the argument that, although an injury-causing accident was possible because of the violation, it was not probable. Where, as here, an injury would be equally or more probable had the employer complied, a designation of the violation as "serious" is not required and in fact makes no sense.

13. There is no question that Phoenix demonstrated such concern in this case. It complied with the letter of the regulations whenever reasonably possible; and as we have noted, it was employing more safety monitors than the regulations mandated. We have noted, *supra,* that the cost of employing two workers to do nothing but monitor during phase three operations cannot have been minor for a small contractor such as Phoenix and may well have exceeded the cost of using various complying safety devices.

14. *Accord, Triple "A" South,* 9 O.S.H.Cas. (BNA) 1542 (Rev.Comm'n 1981); *Kenneth P. Thompson Co.,* 8 O.S.H.Cas. (BNA) at 1703; *Leiser Painting*

*& Decorating, Inc.,* 8 O.S.H.Cas. (BNA) 1743 (Rev.Comm'n 1980) (ALJ op.); *Rodney E. Fossett,* 1979 O.S.H.Dec. (CCH) ¶ 23,989 (Rev. Comm'n 1979); *Buccola Masonry, Inc.,* 6 O.S.H. Cas. (BNA) 2060 (Rev.Comm'n 1978) (ALJ op.); *Power Systems, Inc.,* 1978 O.S.H.Dec. (CCH) ¶ 23,079 (Rev.Comm'n 1978) (ALJ op.); *Ray Boyd Plaster & Tile, Inc.,* 6 O.S.H.Cas. (BNA) 1648 (Rev.Comm'n 1978); *Triple "A" South,* 1978 O.S.H.Dec. (CCH) ¶ 22,878 (Rev. Comm'n 1978) (ALJ op.); *Otis Elevator Co.,* 6 O.S.H.Cas. (BNA) 1555 (Rev.Comm'n 1978); *Southwestern Indus. Contractors & Riggers, Inc.,* 1978 O.S.H. Dec. (CCH) ¶ 22,606 (Rev.Comm'n 1978) (ALJ op.).

15. We note that in reaching this conclusion, it is unnecessary to resolve the factual dispute as to which stage of work was in progress when the citation was issued, as resolving that subordinate issue goes only to whether certain motion-stopping devices could have been used. However, even if they could have been used, a *de minimis* classification nevertheless would be mandated, as the monitors provided protection at least equivalent to warning lines, one of the indisputably complying methods.

travenes regulations, regardless of a good-faith belief that it is adequately protecting its employees' interests, is hardly surprising. However, to extend such reasoning to suggest that employers always commit *serious* violations when they deviate from the black letter of the regulations, even where the alternative protections equal or exceed those mandated by law, is quite another thing. The latter rule would eviscerate the *de minimis* category and could even prevent certain jobs from being performed where, as here, strict technical compliance is infeasible even though non-conforming measures might easily assure safety.[16]

We are similarly unpersuaded that *Bunge* applies to this case. There, we considered the issue of grain-dust accumulations, in violation of housekeeping regulations, that presented the hazard of a possible explosion. As we have observed, *supra* note 12, we held this condition to be a serious violation based upon the substantial probability that death or serious injury would result should such an accident occur. In so holding, we emphasized that "the seriousness of the violation depends on the hazard produced by the condition." 638 F.2d at 834. In that case, absent the violation there was no hazard at all, as the employer had not undertaken any alternative safety measures. Thus, the condition without question produced the hazard.

The instant case is patently distinguishable. Here, the condition in violation of the regulations did not produce any additional hazard—a requirement that is implicit in the above language from *Bunge*—and therefore should not have been considered a serious violation. *Bunge* stands only for the proposition that where a condition creates a hazard that may cause death or serious injury, a "serious" designation is

warranted even if the possibility of such injury is remote; but, where, as in this case, the condition cannot be said to have created an additional hazard, the *Bunge* logic does not apply.[17]

## V. *Conclusion.*

For the aforementioned reasons, the petition for review is denied as to the finding of a violation but granted as to the *de minimis* classification and the imposition of penalties. This may very well be a case in which OSHA, in its discretion, should not have issued a citation. Under the facts presented here, where the company has acted in good faith to achieve the purpose of the regulations—to ensure workers' safety—enforcement at more than a *de minimis* level arguably would constitute what we have denounced, in a different context, as "regulation *ad absurdum.*" *American Petroleum Inst. v. Environmental Protection Agency*, 787 F.2d 965, 972–73 (5th Cir.1986). In fact, the *de minimis* category appears particularly well-tailored to circumstances such as this. But while we emphasize the pointlessness of overzealous, hypertechnical enforcement of OSHA standards, we also stop far short of suggesting to employers that they are free to disregard regulations and make their own safety evaluations. Under only limited circumstances, such as those here, may an employer fail to comply with safety regulations and avoid the consequent penalties.

AFFIRMED IN PART; REVERSED IN PART.

GARWOOD, Circuit Judge, dissenting:

While I agree with much of the cogent majority opinion, I am unable to concur in its ultimate holding that the particular vio-

**16.** We also note that in *RSR* we considered a situation in which the employer had only a subjective good-faith belief that its alternative measures provided the intended protection, but not one in which the protection *actually* equaled or exceeded that required by regulation. There, we were "wholly unconvinced by RSR's claim that the [subject] escrow policy furthered the objectives of the lead standard" involved in that case. *Id.* Here, as discussed repeatedly, *supra*, we are confronted with a situation in

which the measures employed without question provided equal or greater protection. For the above reasons, we conclude that *RSR* is inapposite to the situation before us.

**17.** Additionally, we note that were we to expand our holdings in *RSR* and *Bunge* to reach the instant facts, we would necessarily create a conflict with OSHA's own precedent, discussed *supra*.

lation in question is, as a matter of law, no more than *de minimis.*

The majority concludes that this is a situation where there is no significant difference between the protection provided by the employer and that afforded by technical compliance with the regulations, which required the presence of a warning line system. It seems to me that it was the employer's burden to prove that the presence of a warning line would not have diminished the risk of falling off the roof and that, at most, the employer may have created a fact issue in this respect, which should have been, but was not, resolved by the administrative law judge.

The compliance officer's testimony is consistent with the commonsense observation that a warning line has the potential advantage over monitors in that the monitors may from time to time be distracted or inattentive.[1] I readily concede that the warning line would not enhance safety for those employees working outside of it. It is also true that the employees, whom the compliance officer testified she observed, were then working near the edge of the roof in areas which would have been outside of a properly placed warning line. But it seems obvious that the employees worked not only along the edge of the roof, but also on the portions of the roof which would have been protected by a proper warning line. There is no suggestion that

the employer maintained a warning line until the work was completed up to those parts of the roof within six feet of the edge.

The relevant standard violated here was that provided in 29 C.F.R. § 1926.500(g)(1).[2] Due to the size of the roof, the only available alternatives for compliance were those provided in paragraphs (i) and (ii). The motion-stopping safety system called for by paragraph (i) was not employed. The employer complied with the portion of paragraph (ii) calling for monitors for employees working between the warning line and the roof edge, but did not comply with the basic requirement of paragraph (ii) that there be a warning line system at least six feet from the roof edge. *See* 29 C.F.R. § 1926.500(g)(3). There is no showing that all the employees working on the roof on this occasion worked only within six feet of the roof edge. That is a matter on which the employer should have the burden to the extent that it relies on such a state of facts as a basis for claiming that the violation was no more than *de minimis* because compliance with the regulations would not have enhanced safety beyond that provided by the employer. We should thus make the wholly logical assumption that the employees were working both outside of and within the area where protection would have been afforded by the warning line.[3]

1. As the last sentence of the preceding paragraph in the text reflects, I do not accept this testimony of the compliance officer as conclusive; but the majority determines that the converse was established as a matter of law, even though there was no direct testimony to the contrary and the matter was not addressed by the administrative law judge.

2. This section of the regulations provides:
"During the performance of built-up roofing work on low-pitched roofs with a ground to eave height greater than 16 feet (4.9 meters), employees engaged in such work shall be protected from falling from all unprotected sides and edges of the roof as follows:
"(i) By the use of a motion-stopping-safety system (MSS system); or
"(ii) By the use of a warning line system erected and maintained as provided in paragraph (g)(3) of this section and supplemented for employees working between the warning line and the roof edge by the use of either an MSS system or, where mechanical equipment

is not being used or stored, by the use of a safety monitoring system; or
"(iii) By the use of a safety monitoring system on roofs fifty feet (15.25 meters) or less in width (see Appendix A), where mechanical equipment is not being used or stored."

3. So far as I am aware, the employer has never contended, here or below, that its employees were working *only* within six feet of the roof's edge on the occasion in question, and its description of how it conducted its operations plainly suggests the contrary. It also seems obvious that the citation, which alleged as a violation the absence of a warning line system (and motion-stopping safety system), was not in any way based on how close to the roof's edge the employees were working: under section 1926.500(g)(1)(ii) (note 2, *supra*), closeness to the edge, as such, can produce a violation *only* when there is *neither* a motion-stopping safety system *nor* a safety monitoring system, and here the citation does not allege the absence of a proper safety monitoring system (nor has any

In that situation, it is certainly not clear that, as a matter of law, the protection which would have been afforded by a warning line and at least one monitor—which the employer would have had to have anyway for employees working near the edge—was no safer than the two monitors and no warning line which the employer actually provided.

Accordingly, I respectfully dissent.

one ever contended that such a system was     lacking).